# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**ROCCO GRASSO II**
        **Plaintiff,**

    **v.**                               **Case No. 13-C-0112**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

---

### DECISION AND ORDER

Plaintiff Rocco Grasso applied for social security disability benefits, claiming that he could not work due to mental impairments and seizures. The Social Security Administration ("SSA") denied the application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. Plaintiff requested review by the Appeals Council, but the Council declined, making the ALJ's decision the SSA's final determination on the application. See Pepper v. Colvin, 712 F.3d 351, 361 (7th Cir. 2013). Plaintiff now seeks judicial review, arguing that the ALJ erred by not finding him presumptively disabled under the mental retardation Listing and by failing to adequately address his limitations in concentration, persistence, and pace.[1]

### I. APPLICABLE LEGAL STANDARDS

**A.  Disability Standard**

In determining whether a claimant is disabled, the ALJ employs a sequential five-step

---

[1]Plaintiff's 39-page main brief and 14-page reply brief exceed the page limitations in the court's briefing letter. (R. 4 at 2.) Counsel is advised to comply with these limitations in the future.

test.  See, e.g., Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012).  At step one, the ALJ asks whether the claimant is currently working, what the agency calls "substantial gainful activity" ("SGA").  If the claimant is working at SGA levels, he will be found not disabled.  20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not working, the ALJ determines whether he suffers from a severe, medically determinable impairment or impairments.  An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 416.920(a)(4)(ii) & (c).

Third, if the claimant has a severe impairment, the ALJ must determine whether the impairment qualifies as presumptively disabling under SSA regulations.  20 C.F.R. § 416.920(a)(4)(iii).  These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").  To meet or equal a listed impairment, the claimant must satisfy all of the "criteria" of the particular Listing.  Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).  For instance, Listing 12.05 provides:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> Or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> Or

2

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. Thus, in order to meet this Listing, the claimant's impairment must meet the diagnostic description in the introductory paragraph (i.e., "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period") and then satisfy one of the four sets of criteria listed in sections A, B, C, and D. See Sherrod v. Astrue, No. 10-C-0451, 2011 WL 284349, at *2 (E.D. Jan. 25, 2011) (citing Bixler v. Astrue, 734 F. Supp. 2d 601, 605 (S.D. Ind. 2010)).

In order to meet other mental impairment Listings, including those pertaining to Organic Mental Disorders (12.02), Affective Disorders (12.04), and Anxiety-Related Disorders (12.06), the claimant must demonstrate the necessary degree of limitation under the "paragraph B criteria": (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. The degree of limitation in the first three areas is evaluated on a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth area (episodes of decompensation) on a four-point scale: none, one or two, three, four or more. 20 C.F.R. § 404.1520a(c). In order to be considered presumptively disabled, at least two of the following must be present: (1) marked restriction of activities of

3

daily living; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of concentration, persistence, and pace; or (4) repeated episodes of decompensation each of extended duration.  Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010).[2]

Fourth, if the claimant's impairment does not meet or equal a Listing, the ALJ must determine whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work.  20 C.F.R. § 416.920(a)(4)(iv).  RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule.  SSR 96-8p.

Fifth, if the claimant cannot perform his past work (or if he lacks a relevant work history), the ALJ must determine whether, given his RFC, age, education, and work experience, he can perform other work.  20 C.F.R. § 416.920(a)(4)(v).  The claimant bears the burden of presenting evidence at steps one through four, but at step five the burden shifts to the SSA. The ALJ may in recognition of this burden summon a vocational expert ("VE") to provide testimony regarding other jobs the claimant could do despite his limitations.  See Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011).

B.    Judicial Review

The reviewing court will reverse an ALJ's decision only when it lacks the support of substantial evidence in the record, Pepper, 712 F.3d at 361, or rests on an error of law, Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004).  Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Under this deferential standard, the court may not re-

_____

[2]Certain mental health Listings also have "paragraph C" criteria, which are not at issue in this case.

4

weigh the evidence or substitute its judgment for the ALJ's; if reasonable minds could differ over whether the claimant is disabled, the court must uphold the decision under review. Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ must build a logical bridge from the evidence to her conclusion, but she need not provide a complete written evaluation of every piece of testimony and evidence. Pepper, 712 F.3d at 362. The ALJ need only minimally articulate her reasoning, Filus v. Astrue, 694 F.3d 863, 869 (7th Cir. 2012); Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008), and in analyzing an ALJ's opinion for fatal gaps or contradictions, the court must give the opinion a commonsensical reading rather than nitpicking at it, Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Supporting Materials

On October 27, 2009, plaintiff applied for supplemental security income ("SSI"), alleging a disability onset date of October 1, 2006. (Tr. at 191.) In a disability report, plaintiff indicated that he could not work due to depression, attention deficit hyperactivity disorder ("ADHD"), a learning disability, and seizures. He indicated that he did not understand what he read, no one would hire him because he did not graduate high school and was very slow, and his depression was getting worse. He stated that he last worked on September 1, 2008, a temp job that lasted for one day. (Tr. at 222.) He reported other past work as a pizza chef at a restaurant and a laborer at a recycling business. (Tr. at 223.) Plaintiff indicated that he had not seen a doctor since 2005 (Tr. at 224-25) and had not been able to refill his medications due to lack of income (Tr. at 227). His highest level of education was tenth grade, and he was always in special education classes. (Tr. at 226.)

5

In a function report, plaintiff indicated that he lived with his mother. On a typical day he got up, ate, then watched TV. After lunch, he waited for his two sons to get home from school, then called them. After supper, he watched more TV. (Tr. at 229.) He denied taking care of anyone else or any pets. He reported no problems with personal care (Tr. at 230) but did need reminders to take medication. He indicated that he prepared his own meals on a daily basis. (Tr. at 231.) He also reported doing dishes or laundry when his mother told him. (Tr. at 231.) He indicated that he went out infrequently, three to four times per week, because he did not want to see anyone. He shopped for food three to four times per week, going in and out quickly. (Tr. at 232.) He was able to go out on his own. (Tr. at 233.) He was also able to pay bills and count change but could not handle a checkbook. (Tr. at 232.) He reported hobbies of watching TV and fishing. (Tr. at 233.) He reported no problems getting along with others but indicated that he did not want to be by anyone. He complained of problems with memory, completing tasks, concentration, understanding, and following directions. He indicated that he got sidetracked when trying to complete tasks, had a hard time concentrating, and did not understand a lot. He stated that he could pay attention for five to ten minutes. He found it hard to follow written instructions; spoken instruction were better. (Tr. at 234.) He indicated that he got along OK with authority figures but did not handle stress well. (Tr. at 235.)

## B.    SSA Consultants

As plaintiff had not seen a doctor since the alleged onset date, the SSA arranged for a mental status evaluation with Richard Hurlbut, Ph.D, on December 8, 2009. Dr. Hurlbut administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), on which plaintiff obtained a full-scale IQ score of 70, placing him in the borderline range. Plaintiff's verbal comprehension and perceptual reasoning scores of 78 and 71 also fell within that range. (Tr. at 260.) During

6

the evaluation, plaintiff indicated that his chief complaint was learning disability, which was diagnosed in grade school. He was in LD classes throughout school and had particular problems comprehending things. He further related losing concentration rapidly, difficulty reading, and difficulty doing math. Plaintiff also related a diagnosis of attention deficit disorder, which made it hard for him to stay focused. In the past he took Ritalin, which helped him concentrate and stay on task better; he stopped due to lack of insurance and not enough money. He reported taking Depakote for seizures, Ibuprofen for pain, Amitriptyline for sleep, and Celexa for depression. He was at the time in jail for failure to pay child support and came to the evaluation on a Huber release.[3] He reported flashbacks and trouble sleeping after witnessing another inmate, an acquaintance out of jail, hang himself. He denied any seizures for several years, feeling that the medication worked well. (Tr. at 261.) He further reported being diagnosed with depression, and his Celexa was just increased. He indicated that he did not want to talk to anybody and, when out of jail, he would stay home and isolate himself. He also reported some paranoid thoughts and heavy past drinking. (Tr. at 262.)

Plaintiff reported past work cooking at a restaurant called Papa Mike's and doing labor jobs. His longest job was at Auburndale Recycling. His most recent work was a one day stint in September 2008 through Labor Ready. When not in jail, he reported living with his mother. He helped a little bit at home, cooking and cleaning, going to the supermarket. (Tr. at 263.) Plaintiff's mother, who accompanied him to the evaluation, reported that, when not in jail, plaintiff spent a lot of time sleeping, watching television, and going for bike rides. He had little contact with people. He sometimes helped around the house, but that was rare. He did some

---

[3]He reported past jail stints for drunk driving, fourth degree sexual assault, drugs, and burglary. (Tr. at 262.)

7

cooking and kept himself clean.  When with people, he got along okay, but he avoided them. (Tr. at 263.)  He was avoiding alcohol before going to jail.  All his daily living needs were done independently.  (Tr. at 264.)

On direct mental status evaluation, plaintiff was able to give his date of birth and the date of the evaluation; he named the current president and his predecessor, the governor of Wisconsin, and four states bordering Wisconsin.  He was unable spell the word "world" backwards or count backwards from 100 by 7's or 3's, but he could perform simple addition and subtraction.  With respect to specific work capacity issues, Dr. Hurlbut indicated that plaintiff "would not have any problem with simple instructions, understanding, remembering, and carrying them out, and he would probably get along well with supervisors and coworkers, except to the extent he isolates himself when depressed.  He would have difficulty, however, with concentration, attention, and work pace and difficulty with change."  (Tr. at 263.)  Dr. Hurlbut diagnosed learning disability; major depression, recurrent, severe; post-traumatic stress disorder symptoms in jail; attention deficit disorder; borderline intellectual functioning; and seizure disorder; with a GAF of 45 to 50.[4]  (Tr. at 264.)

On December 28, 2009, Pat Chan, M.D., reviewed the file, noting the lack of medical documentation of plaintiff's alleged seizure disorder.  During the evaluation with Dr. Hurlbut, plaintiff indicated that he had been taking Depakote since his incarceration in November 2009, and that he had not had any seizure activity in years, three in his entire adulthood.  At the time

_____

[4]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and his overall level of functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others.  Scores of 51-60 reflect "moderate" symptoms and 41-50 "severe" symptoms.  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

8

of his SSI application, plaintiff was not on medication and had not been on any anti-seizure medication since 2005 and still had not had much seizure activity. Dr. Chan concluded that plaintiff's seizure disorder was not severe. (Tr. at 266.)

On December 30, 2009, Jack Spear, Ph.D, completed a psychiatric review technique form ("PRTF"), evaluating plaintiff under Listings 12.02, 12.04, 12.05, and 12.06. (Tr. at 271.) Under 12.02, Dr. Spear noted plaintiff's ADHD and history of being on Ritalin as a child due to hyperactivity. (Tr. at 272.) Under 12.04, Dr. Spear noted evidence of depressive syndrome characterized by sleep disturbance, decreased energy, and difficulty concentrating. (Tr. at 274.) Under 12.06, Dr. Spear noted evidence of recurrent and intrusive recollections of a traumatic experience. (Tr. at 276.) Under the B criteria of these Listings, Dr. Spear found mild restriction of activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation, each of extended duration. (Tr. at 281.) Under Listing 12.05, Dr. Spear checked the boxes for "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" and for a "valid verbal, performance, or full scale IQ of 60 through 70." (Tr. at 275.) However, on the summary page of the form, Dr. Spear indicated that plaintiff did not meet any Listings and that an RFC assessment was necessary. (Tr. at 271.)

In his mental RFC assessment, Dr. Spear found moderate limitation in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; working in coordination with others without distraction; completing a normal workday without interruptions from psychological symptoms; responding appropriately to supervisors; getting along with co-

9

workers; and responding appropriately to changes in the work setting. He found no significant limitations in the other areas listed on the form. (Tr. at 267-68.) Based on Dr. Hurlbut's evaluation, Dr. Spear expected that plaintiff "could sustain the basic mental demands of unskilled work, with moderate restrictions in [concentration, persistence, and pace] and social skills." (Tr. at 269, 283.)

On January 4, 2010, the SSA denied plaintiff's application on initial review. (Tr. at 96, 98.) On February 8, 2010, plaintiff requested reconsideration (Tr. at 110), prompting further review. On April 14, 2010, Roger Rattan, Ph.D, completed a PRTF, also evaluating the claim under Listings 12.02, 12.04, 12.05, and 12.06. (Tr. at 287.) Under the B criteria of Listings 12.02, 12.04, and 12.06, Dr. Rattan found mild restriction of activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation, each of extended duration. (Tr. at 297.) Under 12.05, he noted plaintiff's low average IQ (with scores between 70 and 78), but concluded that plaintiff did not precisely satisfy the other diagnostic criteria of the Listing. (Tr. at 291.) In his mental RFC assessment, Dr. Rattan found moderate limitation in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with others without distraction; interacting appropriately with the general public; responding appropriately to supervisors; getting along with co-workers; and responding appropriately to changes in the work setting. He found no significant limitations in the other areas listed on the form. (Tr. at 301-02.) In his narrative assessment, Dr. Rattan concluded that while plaintiff had severe mental impairments he remained capable of handling the basic mental demands of unskilled work. (Tr. at 303.)

On April 14, 2010, Syd Foster, D.O., completed a physical RFC report, finding no

10

exertional limitations (Tr at 305-06) and no non-exertional limitations aside from avoidance of hazards such as machinery or heights (Tr. at 307-09). Dr. Foster explained that while plaintiff's seizure disorder did not appear to be severe, he nevertheless needed to avoid hazards. (Tr. at 312.)

Based on this evidence, the SSA denied the reconsideration request on April 15, 2010. (Tr. at 97, 113), so plaintiff requested a hearing before an ALJ (Tr. at 122). In a pre-hearing brief, plaintiff argued that he met Listing 12.05C based on Dr. Spear's report, his full-scale IQ of 70, and his other impairments of depression, anxiety, and ADHD. (Tr. at 168-78, 180-90.)

## C. Hearing Testimony

On February 15, 2011, plaintiff appeared with counsel for his hearing before the ALJ. (Tr. at 62.) At counsel's request, the ALJ agreed to hold the record open for additional mental health records from Stevens Point. (Tr. at 67, 93-94.)

### 1. Plaintiff

Plaintiff testified that he could not work because he had a hard time paying attention and his mind wandered. He indicated that when he was on his medication it was better. (Tr. at 68.)

Plaintiff testified that he last worked in 2008 through a temporary service – a one day assignment unloading trucks and a one month stint at a tire recycling place. (Tr. at 68, 77.) He also reported working for a short time at a tree farm pulling trees and bagging them for shipment. These employers indicated that they did not need him anymore. (Tr. at 69.)

Plaintiff indicated that he was separated from his wife and had two children, ages eight and nine. (Tr. at 69.) The children lived with their mother, and plaintiff saw them infrequently although they talked on the phone every day. (Tr. at 69-70.) Plaintiff testified that his wife was

considering giving him custody of the youngest. (Tr. at 70.)

Plaintiff testified that he lived with his sister. He indicated that he never had a driver's license and got around by bus or his sister drove him. He indicated that he smoked about ½ pack per day and rarely drank. (Tr. at 70.) He indicated that he had been dating since the summer. (Tr. at 71.) He denied using a computer. He stated that he had been incarcerated several times, including for failure to pay child support. (Tr. at 71.)

Plaintiff testified that on a typical day he stayed at home, cleaning or watching TV. He indicated that he had not recently seen a doctor. He last had a seizure about three years ago. He indicated that he was supposed to be taking Celexa, Ritalin, and Depakote, but had no insurance. His sister supported him, including paying for cigarettes. (Tr. at 72.)

Plaintiff testified that he had trouble following a TV program and could not pay attention through a movie. He denied problems reading but indicated that he was not good at math. (Tr. at 73.) He further indicated that he sometimes had problems with memory, and that his sister had to give him a list if he went to the store. He indicated that past employers, including the recycling center and the pizza place where he worked as a cook, told him he was too slow. (Tr. at 74.) He also indicated that he had been criticized for failing to follow procedures because he would forget them or his mind would wander. (Tr. at 74-75.) He testified that his mental ability improved when he took his medication, but he had not done so since 2008 due to financial problems and lack of insurance. (Tr. at 75.)

Plaintiff also testified to problems with stress, which led to irritation, crying, and bad migraines. He complained of daily migraines, for which he took Ibuprofen and laid down. The migraines lasted from three hours to all day. (Tr. at 76.) He testified that he felt stress due to lack of money and living with his sister. (Tr. at 76-77.) He indicated that he also experienced

12

stress at work when he got yelled at for not working fast enough.  Plaintiff testified that he attended school to the eleventh grade, taking special education classes, and had not obtained his GED.  (Tr. at 77.)

**2.     VE**

The ALJ also summoned a VE to the hearing.  The ALJ assumed no past substantial gainful activity.  (Tr. at 80.)  The ALJ then asked the VE a hypothetical question, assuming a person of plaintiff's age, education, and work experience, with no exertional limitations but needed to avoid even moderate exposure to hazards.  (Tr. at 80.)  The individual could perform simple, repetitive, and routine work tasks.  (Tr. at 81.)  The VE testified that such a person could work as an industrial cleaner, store laborer, and cooker helper.  (Tr. at 81.)  If the person were further limited to low stress work, meaning occasional decision making, occasional changes in the work setting, and no strict production quotas, these jobs could still be done.  (Tr. at 83.)

The ALJ further asked the VE to consider a person of plaintiff's age, education, and work experience, with the verbal comprehension, perceptual reasoning, working memory, and processing speed scores set forth in Dr. Hurlbut's report.  (Tr. at 84.)  The VE testified that a person with those scores could perform the jobs she identified.  (Tr. at 84.)  The ALJ asked the VE to specifically consider the full-scale IQ score of 70 in the report, and the VE testified that a person with that borderline score could perform these simple, unskilled jobs.  (Tr. at 84-85.)  However, if the person would be off task approximately 15% of the day due to impaired concentration, persistence, or pace, in addition to customary breaks, he could not maintain competitive employment.  (Tr. at 85.)

13

**D.   Post-Hearing Records**

On March 4, 2011, plaintiff provided records from Ministry Psychiatry, Stevens Points, dated January 2005 to May 2006.  (Tr. at 313.)  On January 5, 2005, plaintiff saw Dr. Jerold Harter for his first follow up appointment after starting Methylphenidate[5] for treatment of ADD with corresponding dysphoria and temper problems.  Plaintiff reported tolerating the medication well without any side effects and noticed considerable improvement, particularly with his temper.   His mood had improved as well.   He did report frequently missing doses of Methylphenidate due to his work in the evenings at a restaurant and asked about switching to a once-a-day form of medication.  Dr. Harter diagnosed dysthymic disorder; alcohol abuse; ADHD, predominantly inattentive type; and learning disorder, NOS.  He switched plaintiff from Methylphenidate to Concerta.  (Tr. at 320.)

Plaintiff returned to Dr. Harter on February 11, 2005, indicating that he could not tolerate Concerta because of stomach upset and so switched back to Methylphenidate.  He reported being very satisfied with the medication, with no angry outbursts or problems with irritability. He reported looking forward to starting a new job at a cheese factory doing assembly line work. Dr. Harter found plaintiff to be doing well and continued his medications, Methylphenidate and Ambien for sleep.  (Tr. at 319.)

Plaintiff returned for follow up on April 8, 2005, reporting symptoms of depression and anxiety.  Dr. Harter continued Methylphenidate and Ambien and started Mirtazepine, an anti-depressant.[6]  (Tr. at 318.)  Plaintiff missed his next two appointments, returning on November

_____

[5]Methylphenidate (Ritalin) is used to control symptoms of ADHD in adults and children. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html.

[6]http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697009.html.

14

3, 2005. (Tr. at 317-18.) He reported missing sessions to help his sister, who had cancer. In the meantime, he reported developing more anxiety symptoms, and that his dose of Methylphenidate might be too strong, making him jittery. He no longer felt sedated from the Mirtazepine. On mental status exam, his mood was euthymic, affect appropriate with a full range, and thought processes coherent. Dr. Harter discontinued Methylphenidate, substituting Adderall; increased Mirtazepine; and continued Ambien. (Tr. at 317.)

Plaintiff next saw Dr. Harter on February 1, 2006, doing better overall on his medications with improved mood. He reported starting a new job, working third shift at Golden Country Foods for the past two weeks. Overall, he was doing well but requested switching back from Adderall to Methylphenidate. Dr. Harter made that change, continuing other medications. (Tr. at 316.)

Plaintiff returned for routine follow up on May 2, 2006, complaining that the Methylphenidate made him edgy, anxious, and sometimes almost paranoid. He reported being laid off by Golden Country Foods and was looking for work. He appeared pleasant and cooperative and denied any ongoing problems with depression. Dr. Harter discontinued Methylphenidate due to side effects, resumed generic Adderall, and continued Ambien and Mirtazepine. (Tr. at 315.)

E.    **ALJ's Decision**

On June 13, 2011, the ALJ issued an unfavorable decision. At step one, the ALJ found that plaintiff had not engaged in SGA since October 27, 2009, the application date.[7] At step two, the ALJ found that plaintiff had the severe impairments of learning disability, major

_____

[7]Plaintiff alleged a 2006 onset date, but SSI is not payable prior to the month following the month in which the application was filed. See 20 C.F.R. § 416.335.

depressive disorder, attention deficit hyperactivity disorder, and borderline intellectual functioning.  (Tr. at 28.)

At step three, the ALJ found that plaintiff's mental impairments did not qualify as presumptively disabling, first considering Listings 12.02, 12.04, and 12.06.  (Tr. at 28.)  Under the B criteria, the ALJ found mild restriction of activities of daily living, noting that plaintiff reported that he cooks, performs a full range of household chores, shops, and performs all personal care tasks independently.  (Tr. at 29.)  In social functioning, the ALJ found mild difficulties, noting that while plaintiff reported social isolation and a desire not to be around others outside of his family, he dated and socialized with his family on a regular basis.  (Tr. at 29.)  The ALJ found moderate difficulties in concentration, persistence, and pace, based on plaintiff's complaints of poor memory, difficulty completing tasks, and difficulties following instructions, and testing demonstrating borderline intelligence.  However, the ALJ declined to find a greater limitation, as "the evidence still suggests a reasonably ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  (Tr. at 29.)  Finally, the ALJ found that plaintiff experienced no episodes of decompensation of extended duration.  (Tr. at 29.)

The ALJ next turned to Listing 12.05C, rejecting the argument in plaintiff's pre-hearing brief because plaintiff failed to demonstrate significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.  (Tr. at 30.)  The ALJ noted that Dr. Spear found that plaintiff met this diagnostic description, but the ALJ gave his opinion very little weight, as it was inconsistent with the overall evidence.  The ALJ found no valid basis for a diagnosis of mental retardation, as there was no evidence of deficits in adaptive functioning prior to the age of 22.  Even with consideration of

16

his borderline intellectual functioning, there were no records dating to before plaintiff's 22nd birthday or any other records supporting adaptive functioning deficits. (Tr. at 30.) Although plaintiff had been diagnosed with attention deficit hyperactivity disorder, there was no indication that condition ever resulted in adaptive functioning deficits; in fact, the evidence showed that his ADHD symptoms were adequately controlled with medication. The ALJ acknowledged plaintiff's mental limitations, but noted that the mere presence of paragraph B limitations did not necessarily indicate deficits in adaptive functioning. Rather, the evidence showed that plaintiff was fairly independent and able to adequately care for himself. For instance, he performed a full range of activities of daily living, including cooking, shopping, and household chores, exhibiting total independence in personal care tasks. In addition, he was previously married, occasionally cared for his children, and currently dated. The ALJ further noted that, despite his designation of mental retardation, Dr. Spear identified no marked or extreme limitations in the paragraph B criteria and opined that plaintiff could sustain the basic demands of unskilled work with moderate restrictions in social functioning and concentration, persistence, and pace, an assessment not consistent with significantly sub-average general intellectual functioning with deficits in adaptive functioning.

More importantly, the ALJ noted that no treating or examining physician ever assessed adaptive functioning deficits or diagnosed plaintiff with mental retardation. Specifically, the records from treating psychiatrist Dr. Harter referenced no such symptomatology and contained no diagnosis of mental retardation or borderline intellectual functioning. Nor did the examining psychologist, who administered testing and had the opportunity examine, observe, and engage plaintiff in dialog, identify any deficits in adaptive functioning or offer a diagnosis of mental retardation. Finally, the ALJ noted that plaintiff had not, prior to the hearing stage, alleged

17

mental retardation or borderline intellectual functioning as an impairment.  (Tr. at 30.)  The ALJ therefore concluded that plaintiff did not have deficits in adaptive functioning or significantly sub-average intelligence.  (Tr. at 30-31.)  Because plaintiff did not meet the diagnostic description in the introductory paragraph, the ALJ found it unnecessary to address the criteria in section C.  (Tr. at 31 n.1.)

The ALJ then determined that plaintiff retained the RFC to perform a full range of work at all exertional levels, limited to simple, routine, repetitive tasks in a low stress work environment with only occasional decision-making, occasional changes in the work setting, and without strict production quotas.  Due to his history of seizures, plaintiff also had to avoid unprotected hazards such as heights and moving machinery.  (Tr. at 31.)  In making this finding, the ALJ considered plaintiff's claims regarding his symptoms and limitations.  (Tr. at 31-32.)  Plaintiff alleged difficulty understanding materials that he read, following television programs, managing money, and performing mathematical calculations.  He also indicated that his depression was worsening, and that he became stressed and irritated easily.  Plaintiff testified that he last worked in 2008, but that was a temporary job for one day only.  (Tr. at 32.) The ALJ stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. When evaluating the claimant's credibility as it relates to his alleged functional limitations, I take into consideration various factors, including the objective medical evidence, the claimant's subjective allegations, medical opinions, and the credibility factors enumerated in SSR 96-7p.

(Tr. at 32.)

The ALJ acknowledged that while the medical evidence demonstrated severe mental

impairments, it did not indicate that those impairments were so severe as to prevent plaintiff

from performing basic work activities. The ALJ noted that there were no treatment records

available for the period under review; rather, plaintiff submitted older psychiatric records, which

included treatment notes from January 2005 to May 2006. These records supported diagnoses

of mood disorder, learning disorder, and ADHD, which the ALJ found to be severe impairments.

However, the ALJ found the records to be of little value in determining plaintiff's functional

abilities since the alleged onset date. If anything, those records suggested good management

of symptoms with medication; thus, although they pre-dated the relevant time, the ALJ found

them consistent with the ability to perform unskilled work. (Tr. at 32.)

The ALJ also considered the consultative examination performed by Dr. Hurlbut in

December 2009. Dr. Hurlbut's testing revealed a full-scale IQ score of 70, which placed

plaintiff in the borderline range. However, based on his examination, Dr. Hurlbut opined that

plaintiff would not have any problem understanding, remembering, and carrying out simple

instructions. Dr. Hurlbut also concluded that plaintiff could get along well with supervisors and

co-workers, except to the extent that he isolated himself when depressed. According to Dr.

Hurlbut, plaintiff would have difficulty with concentration, attention, work pace, and change. (Tr.

at 32.) The ALJ found this assessment consistent with the overall record and with plaintiff's

capacity to perform simple, routine, and repetitive tasks. (Tr. at 32-33.) The ALJ also

considered plaintiff's fair level of activities of daily living. While plaintiff reported difficulty with

cognitive tasks, he was able to cook, perform household chores, shop, navigate public

transportation, and perform personal care tasks. Although he needed reminders for some

tasks, the evidence supported sufficient ability to complete those tasks after instruction. These

activities and ability to function independently suggested that plaintiff's symptoms were

19

manageable and not as limiting as alleged. The ALJ further noted that while plaintiff claimed he could no longer afford his medications, plaintiff prioritized buying cigarettes instead, suggesting a manageability of symptoms inconsistent with his allegations of incapacity. Based on these factors, and the record as a whole, the ALJ did not find support for plaintiff's subjective allegations of disabling impairments. (Tr. at 33.)

The ALJ also considered the medical opinions, giving significant weight to Dr. Hurlbut's assessment that plaintiff was capable of unskilled work with additional mental limitations, as it was consistent with the evidence of record, including plaintiff's self-admitted abilities. The ALJ likewise gave great weight to the opinion of Dr. Rattan, who also found plaintiff capable of handling the basic demands of unskilled work. The ALJ also gave significant weight to the physical assessment of Dr. Foster, who opined that plaintiff could work at all exertional levels but should avoid unprotected hazards. (Tr. at 33.) However, the ALJ gave only "some weight" to Dr. Spear's report. The ALJ rejected Dr. Spear's diagnosis of mental retardation as overwhelmingly inconsistent with the remaining evidence of record, including Dr. Spear's own assessment that plaintiff could sustain the mental demands of unskilled work. (Tr. at 33.) While the ALJ found Dr. Spear's assessment of the B criteria consistent with the overall record and thus entitled to significant weight, the unsupported diagnosis of mental retardation reduced the overall weight afforded to Dr. Spear's report. (Tr. at 33-34.) The record contained no opinions from any treating medical sources. (Tr. at 34.)

The ALJ concluded that while plaintiff's impairments were severe, the evidence did not support a finding that they precluded him from completing work-related activities within the parameters of the designated RFC. The ALJ accommodated plaintiff's allegations of mental impairment by limiting him to simple, routine, and repetitive tasks. To accommodate his

20

limitations in concentration, persistence, and pace, the ALJ minimized his exposure to work-related changes and decision-making, and restricted him from any production quotas. (Tr. at 34.)

Because plaintiff had no past relevant work, the ALJ proceeded to step five. (Tr. at 34.) Relying on the VE's testimony, the ALJ concluded that plaintiff could perform the requirements of occupations such as industrial cleaner, store laborer, and cook/helper. The ALJ therefore found him not disabled. (Tr. at 35.)

Plaintiff requested review by the Appeals Council, but on December 11, 2012, the Council denied his request. (Tr. at 1.)[8] This action followed.

### III. DISCUSSION

Plaintiff first argues that the ALJ erred in finding that he did not meet Listing 12.05C. Specifically, he contends that the ALJ erred by requiring a medical diagnosis of "mental retardation" and by failing to provide an adequate analysis regarding deficits in adaptive functioning. Second, plaintiff argues that the ALJ produced a flawed RFC and incomplete hypothetical question to the VE. Specifically, plaintiff contends that the ALJ failed to adequately account for his limitations in concentration, persistence, and pace. I address each argument in turn.

---

[8]After the ALJ issued her decision, plaintiff submitted additional medical records from St. Francis Hospital (Tr. at 325-67), Aurora Health Care (Tr. at 369-444, 451-71, 472-568), Riverview Hospital (Tr. at 446-50), and Mercy Medical Center (Tr. at 569-880), and in his main brief in this court plaintiff cites records post-dating the ALJ's decision to support his claim that he is limited in normal functioning due to mental restrictions (Pl.'s Br. [R. 13] at 4). Because the correctness of the ALJ's decision depends on the evidence that was actually before her, I may not consider these materials in reviewing her decision. See Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993). Plaintiff does not seek a sentence six remand for consideration of new and material evidence.

## A.    Listing 12.05C

In order to satisfy Listing 12.05C, plaintiff must demonstrate (1) significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. Charette v. Astrue, 508 Fed. Appx. 551, 553 (7th Cir. 2013); Thackery v. Astrue, No. 1:11-cv-01488, 2013 WL 1319595, at *3 (S.D. Ind. Mar. 29, 2013); Lakes v. Astrue, No. 11 C 3592, 2013 WL 623022, at *9 (N.D. Ill. Feb. 19, 2013); Witt v. Barnhart, 446 F. Supp. 2d 886, 894 (N. D. Ill. 2006).  Given plaintiff's full-scale IQ score of 70 and his other severe mental impairments, only the first requirement is at issue here.

Plaintiff argues that the ALJ erred in requiring a psychological diagnosis of mental retardation.  While the ALJ noted that no examining or treating physician diagnosed plaintiff with mental retardation, she denied the Listing claim because plaintiff failed to meet the standard set forth in the introductory paragraph. (Tr. at 30, 31 n.1.)  The ALJ did not make any formal diagnosis a requirement, nor did she err in referencing the medical opinions on this point. See, e.g., Armstrong v. Colvin, No. 1:12-cv-987, 2013 WL 3820936, at *5 (S.D. Ind. July 22, 2013) ("[T]the ALJ did refer to Dr. Henry's report in which Armstrong was diagnosed with borderline intellectual functioning instead of mental retardation, but as the Commissioner points out, the ALJ's statement does not indicate that the ALJ 'required' a diagnosis of mild mental retardation.  Rather, the ALJ based his decision on the lack of deficits in adaptive functioning, as required by the listing, that were found by Dr. Henry at the time of his assessment and diagnosis."); see also Adkins v. Astrue, 226 Fed. Appx. 600, 605 (7th Cir. 2007) ("Significantly, Dr. Spencer refrained from making a diagnosis of mental retardation."); Parker v. Astrue, No.

22

1:08-cv-0966, 2009 WL 2177951, at *7 (S.D. Ind. July 22, 2009) ("In relying on Dr. Shipley's report, the ALJ was not inappropriately requiring a diagnosis of mental retardation in order to find the Listing satisfied. Instead, he was simply relying on a psychiatric evaluation that found no deficits in adaptive functioning.").

Plaintiff further argues that the ALJ erred in finding that the evidence failed to establish deficits in adaptive functioning initially manifested during the developmental period.[9] Listing 12.05 does not define the term "deficits in adaptive functioning." The Seventh Circuit has adopted a simple definition, holding that the "term denotes inability to cope with the challenges of ordinary everyday life." Novy v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007). "If you cannot cope with those challenges, you are not going to be able to hold down a full-time job." Id. In Novy, for instance, the court affirmed the ALJ's determination that the claimant could cope where the evidence showed that she lived on her own, cared for children, paid her bills, and avoided eviction. Id.

Substantial evidence supports the ALJ's finding in this case. First, the ALJ noted the absence of any records, from before plaintiff's 22nd birthday or after, reflecting adaptive functioning deficits. Although plaintiff had been diagnosed with ADHD, the evidence showed that his symptoms were adequately controlled with medication. Second, the ALJ noted that plaintiff was fairly independent and able to adequately care for himself, performing a full range of activities including cooking, shopping, household chores, and exhibiting total independence

_____

[9]Plaintiff argues that the ALJ made findings consistent with the establishment of deficits in adaptive functioning, but in support he quotes a portion of the ALJ's decision in which the ALJ summarized plaintiff's claims. (Pl.'s Br. [R. 13] at 16-17.) The ALJ did not endorse plaintiff's subjective allegations. (Tr. at 33.)

23

in personal care tasks.[10]  Previously married, he occasionally cared for his children and currently dated.  Third, the ALJ noted that no treating or examining physician ever assessed adaptive functioning deficits or diagnosed plaintiff with mental retardation.  The records from treating psychiatrist Dr. Harter referenced no such symptomatology, nor did they contain a diagnosis of mental retardation or borderline intellectual functioning, and Dr. Hurlbut identified no deficits in adaptive functioning and offered no diagnosis of mental retardation based on his testing.[11]  (Tr. at 30.)  The ALJ adequately explained her conclusion on this point; she did not make a single, conclusory statement, as plaintiff contends.  Nor is it the case that the ALJ failed to cite any medical opinions, as plaintiff also contends; the ALJ specifically credited Dr. Rattan's opinion, which found Listing 12.05 unmet.  (Tr. at 33, 287, 291.)[12]

_____

[10]Plaintiff argues that the record does not support the finding that he could cook.  In his function report, plaintiff admitted that he was able to prepare his own meals (Tr. at 231), and at the hearing plaintiff testified to working as a cook (Tr. at 74).  That his supervisor may have yelled at him for not cooking fast enough at the restaurant (Tr. at 77) does not mean that the ALJ erred in citing plaintiff's ability to feed himself as one factor in her analysis.  Plaintiff admits that he did household chores but indicates that, in his function report, he wrote that his mother had to tell him to do them.  (Tr. at 231.)  The ALJ acknowledged that plaintiff needed reminders for some tasks but reasonably found that the evidence supported sufficient ability to complete them after instruction.  (Tr. at 33.)

[11]In his reply brief, plaintiff argues that Dr. Hurlbut did make findings concerning adaptive functioning.  (Pl.'s Reply Br. [R. 18] at 5.)  Arguments raised for the first time in reply are waived.  Nationwide Ins. Co. v. Cent. Laborers' Pension Fund, 704 F.3d 522, 527 (7th Cir. 2013).  Even if not waived, the argument fails.  In the portion of Dr. Hurlbut's report plaintiff quotes, Dr. Hurlbut related plaintiff's complaints regarding his learning disability, which was diagnosed in grade school.  Plaintiff reported being in LD classes, with difficulty concentrating, reading, and doing math.  (Tr. at 261.)  Dr. Hurlbut did not specifically endorse plaintiff's complaints in addressing specific work capacity issues (Tr. at 263), and as the ALJ noted, Dr. Hurlbut diagnosed borderline intellectual functioning rather than mental retardation (Tr. at 264).

[12]Plaintiff argues in reply that it is unclear whether Dr. Rattan considered adaptive functioning.  Dr. Rattan completed the same PRT form as Dr. Spear; Dr. Rattan, like Dr. Spear, could have checked the box for "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" had he

24

Plaintiff counters this evidence with the claims he made in his function report and at the hearing, but the ALJ considered plaintiff's subjective allegations of disabling impairments, finding them unsupported by the record.[13] (Tr. at 32-33.) Plaintiff notes that the ALJ failed to employ the mental retardation criteria set forth in the DSM-IV or other major publications, but she was not required to do so. See Sherrod, 2011 WL 284349, at *9-10. The ALJ properly used the criteria set forth in the Listing itself.

Finally, plaintiff argues that it was improper for the ALJ to reject Dr. Spear's opinion on Listing 12.05C just because Dr. Spear did not find any marked or extreme limitations under the paragraph B criteria. As plaintiff notes, a claimant need not demonstrate marked limitations under the B criteria to satisfy Listing 12.05C (unlike 12.05D). However, the ALJ noted the absence of marked or extreme limitations as one factor supporting her conclusion that Dr. Spear's report was internally inconsistent and thus entitled to little weight on this point. See Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007) (holding that an ALJ may reject an internally inconsistent report). Dr. Spear checked boxes under Listing 12.05 suggesting that

_____

found it appropriate to do so. It was reasonable for the ALJ to conclude that Dr. Rattan's refusal to check the box meant that he found the Listing unmet, just as she considered Dr. Spear's decision to check the box as evidence in support of plaintiff's Listing claim. Plaintiff argues that Dr. Rattan's opinion should carry little weight as a non-examining source, but the record contains no contrary opinion from a treating source, making plaintiff's citation of Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) inapposite.

[13]Plaintiff argues in reply that the ALJ ignored his examples of deficits in adaptive functioning (Pl.'s Reply Br. [R. 18] at 6-7), but the ALJ summarized plaintiff's claims in both the disability application paperwork and the hearing testimony (Tr. at 32). She was not required to specifically discuss every statement plaintiff made. See Pepper, 312 F.3d at 362 (noting that the ALJ need not provide a complete written evaluation of every piece of testimony). Later in reply, plaintiff argues that the court should not consider findings made as to his credibility in reviewing the adaptive functioning issue. (R. 18 at 9.) However, I read the ALJ's decision as a whole, and it would be a needless formality to require the ALJ to repeat substantially similar factual analyses. See Rice, 384 F.3d at 370 n.5.

25

plaintiff met that Listing (Tr. at 275), yet on the medical summary page of the report he indicated that no Listings were met and an RFC summary was necessary (Tr. at 271). As the ALJ noted, Dr. Spear then concluded that plaintiff could sustain the basic mental demands of unskilled work, with moderate restrictions in concentration, persistence, and pace and social functioning. (Tr. at 30, 283.) It was not unreasonable for the ALJ to find that Dr. Spear's ultimate conclusion on plaintiff's ability to work – which the ALJ found consistent with the overall evidence, including the report from Dr. Rattan and the evaluation of Dr. Hurlbut – was inconsistent with deficits in adaptive functioning.

**B.      RFC**

If a claimant's mental impairment is severe but does not meet or equal a Listing, the ALJ must assess the claimant's mental RFC. 20 C.F.R. § 404.1520a(d)(3). The mental RFC assessment used at steps four and five of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the Listings. SSR 96-8p; see also SSR 85-16 (stating that "this evaluation includes consideration of the ability to understand, to carry out and remember instructions and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting"); Hendrickson v. Astrue, No. 5:11-927, 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (explaining that mental RFC requires consideration of four broad categories: understanding and memory, sustained concentration and persistence, social interaction, and adaptation), adopted, 2013 WL 1180864 (N.D.N.Y. Mar. 20, 2013).

In determining mental RFC and in framing questions to the VE, the ALJ must incorporate all of the claimant's limitations, including any deficiencies in concentration, persistence, and pace. See, e.g., O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010). Ordinarily,

26

restricting a claimant to simple, routine, repetitive, or unskilled work will not, by itself, suffice to account for limitations in concentration, persistence, or pace. Id. at 620. However, the ALJ need not use the specific words "concentration, persistence, and pace," and may account for such limitations by specifically excluding those tasks that someone with the claimant's limitations would be unable to perform. Id. at 619.

In the present case, the ALJ found moderate difficulties in concentration, persistence, and pace at step three. (Tr. at 29.) Acknowledging her duty to provide a more detailed analysis at step four, the ALJ limited plaintiff to simple, routine, repetitive tasks in a low stress work environment with only occasional decision-making, occasional changes in the work setting, and without strict production quotas. (Tr. at 31.)

Plaintiff acknowledges that the ALJ addressed his problems with understanding and memory by limiting him to simple, routine tasks; with adaption by limiting decision-making and changes in the work setting; and with concentration and persistence by eliminating strict production quotas. However, plaintiff argues that the ALJ failed to support or explain her finding of no strict production quotas. I disagree.

The ALJ explained that in order to accommodate plaintiff's cognitive impairment, she limited him to simple, routine, and repetitive tasks, and to accommodate his specific limitations in concentration, persistence, and pace, she minimized his exposure to work-related changes and decision-making, and restricted him from any production quotas. (Tr. at 34.) The ALJ explained that these restrictions were supported the objective findings, Dr. Rattan's report, and Dr. Hurlbut's consultative exam. (Tr. at 34.) As the ALJ noted, Dr. Hurlbut found that plaintiff would not have any problem understanding, remembering, and carrying out simple instructions. Dr. Hurlbut also concluded that plaintiff could get along well with supervisors and co-workers,

27

but that he would have difficulty with concentration, attention, work pace, and change. (Tr. at 32, 263.) Based primarily on Dr. Hurlbut's evaluation, Dr. Rattan completed a mental RFC assessment, considering the four broad categories. Under the category of sustained concentration and persistence, Dr. Rattan found moderate limitation in the ability to carry out detailed instructions and maintain attention for extended periods (Tr. at 301), but no significant limitation in the ability to complete a normal workday without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 302). Given this evidence, it was not unreasonable for the ALJ to conclude that no strict production quotas would address plaintiff's problems with concentration, persistence, and pace. Plaintiff cites no evidence supporting a greater limitation in this area, nor does he cite any authority requiring the ALJ to more specifically explain an RFC determination so phrased;[14] courts have regularly affirmed RFC findings of this sort. See, e.g., Zoephel v. Astrue, No. 12-C-726, 2013 WL 412608, at *11 (E.D. Wis. Feb. 1, 2013) (collecting cases); see also Seamon v. Astrue, 364 Fed. Appx. 243, 248 (7th Cir. 2010) ("The ALJ accounted for Seamon's . . . moderate limitation in concentration, persistence, and pace when he included a restriction of 'no high production goals.'").

Plaintiff also argues that the ALJ failed to include all of his limitations in her hypothetical

---

[14]Plaintiff notes that in Tapia v. Astrue, No. 11-C-970, 2012 WL 3100380, at *8 (E.D. Wis. July 30, 2012), Judge Griesbach reversed based on the ALJ's failure to explain why the claimant would be off task 5% of the time, as opposed to a greater period. In that case, however, there was specific evidence that the claimant needed to take extra breaks due to urinary incontinence, in addition to concentration problems stemming from a mental impairment. The record in this case contains no evidence that plaintiff would need extra breaks. The other cases plaintiff cites on this issue affirmed the Commissioner's decision, with the court in Reed v. Astrue, No. 10 C 0001, 2011 WL 3895302, at *13 (N.D. Ill. Aug. 31, 2011), noting that "there is no specific formula for translating the record evidence into a particular percentage deficit."

questions to the VE. Plaintiff notes the various "moderate" limitations found by the psychological consultants, which the ALJ failed to specifically include in his questions. As noted, however, the Seventh Circuit has never insisted on a per se requirement that specific terminology related to concentration, persistence and pace be used in the hypothetical in all cases. O'Connor-Spinner, 627 F.3d at 619. The court has affirmed where, as here, the ALJ's hypothetical specifically excluded those tasks beyond the claimant's abilities. Id.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 8th day of August, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

29